UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X
                                                       :
WALTER CARTHENS o/b/o S.D.C., an                       :
infant,                                                :
                         Plaintiff,                    :
                                                       :        **OPINION AND ORDER**
            - against -                                :
                                                       :        **10 Civ. 7734 (SAS)**
MICHAEL J. ASTRUE, Commissioner                        :
of Social Security,                                    :
                                                       :
                        Defendant.                     :
------------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

Walter Carthens, on behalf of his daughter ("SDC"), brings this action

pursuant to the Social Security Act[1] seeking judicial review of a final decision by

the Commissioner of Social Security (the "Commissioner") denying SDC's claim

for Child Supplemental Security Income ("SSI") benefits.[2]  Carthens requests

_____

[1]      *See* 42 U.S.C. § 405(g) ("section 405(g)").

[2]      *See* Transcript of the Administrative Record ("Tr."), filed as part of
the Commissioner's Answer pursuant to section 405(g), at 76-84.  In his
application, Carthens indicated that SDC (1) has problems seeing; (2) has no
trouble hearing; (3) has problems talking clearly; (4) is not limited in her ability to
communicate; (5) can read simple words but cannot write a simple story with six to
seven sentences, add and subtract numbers over ten, or tell time; (6) is not limited
in her physical abilities; (7) has friends her own age and generally gets along with
adults; (8) is not impaired in her ability to help herself cooperate with others in
taking care of her personal needs; and (9) can keep busy on her own and complete

remand of the case for further administrative proceedings.  The Commissioner cross-moves under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings.  For the reasons set forth below, Plaintiff's request for remand is granted.

## II.     BACKGROUND

### A.      Procedural History

On May 9, 2007, Carthens filed an application with the Social Security Administration (the "SSA") for SSI benefits on behalf of SDC, who was nine years old at the time.[3]  The application stated that SDC was "disabled" from birth but did not provide details about her alleged disability.[4]  On August 7, 2007, the SSA denied the application.[5]  Carthens requested a hearing before an Administrative Law Judge ("ALJ").[6]  On January 11, 2010, Carthens testified at a hearing before ALJ David Ettinger.[7]  In a decision dated January 26, 2010, ALJ

---

homework, but does not complete chores.

[3]     *See id.* at 67.

[4]     *Id.*

[5]     *See id.* at 41.

[6]     *See id.* at 45.

[7]     *See id.* at 22-38.

Ettinger affirmed the denial of benefits.[8]

### B.    The Administrative Record

The administrative record in this case consists of medical, school, and personal records gathered by the SSA at the initial and ALJ hearing levels, and the transcript of the January 11, 2010 hearing.

### 1.    Medical Evidence

SDC has been asthmatic since the age of three.[9]  According to her father, SDC sees Dr. Sean Ramdeen for treatment "every month" or "as need [sic]."[10]  In May 2007, SDC suffered an asthma attack and twice visited Dr. Ramdeen for treatment and consultation.[11]  Dr. Ramdeen's  reports indicate that SDC uses her asthma reliever "less than 2x/week," has never been hospitalized for asthma, has a "nighttime cough," and can exercise without coughing.[12]  Dr. Ramdeen classified SDC's asthma as "mild-intermittent"at the first visit, and "mild-persistent" at the second.[13]  Dr. Ramdeen prescribed medication at each

---

[8]    *See id.* at 4-18.

[9]    *See id.* at 167.

[10]    *See id.* at 30

[11]    *Id.* at 136-139.

[12]    *Id*. at 138.

[13]    *Id.* at 136, 139.

visit.[14]

On June 6, 2007, the SSA asked Dr. Andre Gray, one of SDC's treating physicians, to complete and submit a brief questionnaire detailing SDC's medical condition.  Dr. Gray's answers reflect that, from May 7, 2007 to June 25, 2007, SDC visited him four times for treatment of asthma and eczema.[15]  Dr. Gray assessed SDC to be a "well child,"[16] with "persistent," "permanent" asthma.[17]  He described her symptoms as "mild exercise intolerance, coughing,"[18] and noted that she had "good response to medication."[19]  Dr. Gray also determined that SDC is obese and referred her to a nutritionist.[20]  Plaintiff contends that SDC's obesity is attributable, at least in part, to her asthma medication.[21]  Records submitted by Urban Health Plan, Inc. support the general medical finding that SDC has persistent asthma that causes her some discomfort and fairly frequent doctor visits,

---

[14]     *See id.* at 136, 139.

[15]     *See id.* at 140-141, 159-164

[16]     *Id.* at 140.

[17]     *Id.* at 160-161.

[18]     *Id.* at 161.

[19]     *Id.*

[20]     *See id.* at 172-173, 205.

[21]     *See id.* at 111.

but is not debilitating.[22]

## 2.    Consultative Examinations

On June 18, 2007, Dr. Tomasito Virey, a non-examining consulting physician for the SSA, assessed SDC's condition.[23]  Dr. Virey reported that SDC experiences "about three [asthma] attacks every six months."[24]  He noted that previous attacks were treated at home, by SDC's pediatrician, or outpatient visits to the Emergency Room.[25]  Symptoms included "occasional chest pain with shortness of breath and easy fatigability, but no cyanosis."[26]  Apart from "some eczema on the abdomen and both legs," Dr. Virey did not find any other abnormalities in SDC, and gave her a prognosis of "good to fair."[27]  In Dr. Virey's judgment, SDC "can participate in age-appropriate educational, social, recreational, and physical activities as long as she takes medication regularly and follows up with

---

[22]    *See id.* at 198-222.

[23]    *See id.* at 167.

[24]    *Id.*

[25]    *See id.*

[26]    *Id.*  "Cyanosis is a bluish color to the skin or mucus membranes due to a lack of oxygen in the blood."  *See* http://www.nlm.nih.gov/medlineplus/ency/article/003215.htm

[27]    Tr. at 169-170.

treatment."[28]

On August 6, 2007, "Mohanty, R., Pediatrics" filled out a consultative form to aid the SSA in making its disability determination.  Mohanty found that SDC's impairments were "severe, but [do] not meet, medically equal, or functionally equal" an impairment found in the listings.[29]  Mohanty indicated that SDC did not have marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for herself, or health and physical well-being.[30]  Mohanty did not offer explanations of his findings in the space provided.[31]

### 3.    Teacher Reports

On June 4, 2007, Jane Drexel, SDC's teacher, completed a

---

[28]     *Id.* at 170.

[29]     *Id.* at 175.  If a child has a severe impairment, the SSA determines whether the impairment meets, medically equals, or functionally equals an impairment found in the Regulations, 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings").  If a child suffers from an impairment found in the Listings, the SSA will find the child to be disabled.  *See* 20 C.F.R. § 416.924(d).  If the child's impairment(s) does not meet an impairment found in the Listings, the SSA considers the effects of the child's impairment(s) in six broad domains of functioning.  *See infra* Part III. A.

[30]     *See* Tr. at 176-178.

[31]     *See id.* at 175-178.  Mohanty explained only the determination that SDC suffered a "less than marked" limitation in "health and physical well-being," by describing her asthma and eczema.  *See id.* at 178.

questionnaire at the SSA's request.[32]  The questionnaire asked Drexel to determine

the seriousness of SDC's problems in certain listed categories.[33]  Drexel had been

SDC's teacher for a full year and saw her "all day Monday through Friday,"

teaching "all elementary subjects."[34]  Drexel stated that SDC has problems

"acquiring and using information."[35]

Drexel found that SDC has problems "attending and completing

tasks,"[36] explaining that SDC "often loses focus or creates distractions to avoid

work she perceives as difficult."[37]  Drexel determined that SDC has problems

---

[32]    *Id.* at 115-123.

[33]    *See id.* at 115-121.

[34]    *Id.* at 115.

[35]    *Id.* at 116 (citing SDC's "obvious problem" in "comprehending math problems and expressing ideas in written form;" and "slight problem" in "understanding vocabulary, reading written material, providing organized oral explanations, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions.").

[36]    *Id.* at 117 (citing SDC's "obvious problem" in "refocusing to task, changing from one activity to another, organizing her own things, completing class assignments, completing work accurately without careless mistakes, working without distracting herself, or working at a reasonable pace;" and slight problems in "focusing long enough to finish assigned activit[ies] or task[s] and carrying out multi-step instructions").

[37]    *Id.*

interacting and relating with others,[38] writing that SDC often "requires individual attention from the teacher."[39]  Drexel found that SDC has a problem "caring for . . . herself,"[40] explaining that SDC "has poor impulse control.  She frustrates easily and then reacts inappropriately either by pouting and refusing to work or acting aggressively.  When she calms down she can discuss what happened and identify steps to do better next time – but in the heat of the moment has difficulty controlling her emotions."[41]

Ms. L. Travers, SDC's SETSS teacher,[42] filled out a questionnaire on

---

[38]     *See id.* at 118 (citing SDC's "obvious problem" in "playing cooperatively with other children, making and keeping friends, seeking attention appropriately, expressing anger appropriately, asking permission appropriately, following rules, respecting/obeying adults in authority, using language appropriate to the situation and listener, taking turns in a conversation, and interpreting meaning of facial expression, body language, hints, [and] sarcasm").

[39]     *Id.*

[40]     *Id.* at 120 (citing SDC's "obvious problem" in "handling frustration appropriately, being patient when necessary, using good judgment regarding personal safety and dangerous circumstances, identifying and appropriately asserting emotional needs, responding appropriately to changes in [her] own mood (e.g., calming self), using appropriate coping skills to meet daily demands of school environment, and knowing when to ask for help").

[41]     *Id.*

[42]     "SETSS" stands for "Special Education Teacher Support Services." *See* Plaintiff's Memorandum of Law in Support of Motion for Judgment Remanding for Further Administrative Proceedings ("Pl. Mem.") at 6.

September 14, 2009.[43]  Travers saw SDC and seven other students for one period

daily, five days each week.[44]  Travers determined that SDC has problems acquiring

and using information,[45] writing that "even in the small group class of the . . .

SETSS, SDC has difficulty focusing on the material learned or . . . being taught.

She often questions directions after they are given orally or written."[46]  Travers

also determined that SDC has problems attending and completing tasks,[47]

explaining that she "often needs extra attention from the teacher in order to

---

[43]     *See* Tr. at 125-132.

[44]     *See id.* at 125.

[45]     *See id.* at 126 (citing SDC's "very serious problem" "comprehending and doing math problems;" "serious problem" "reading and comprehending written material, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions;" and "obvious problem" "comprehending oral instructions, understanding school and content vocabulary, understanding and participating in class discussions, and providing organized oral explanations and adequate descriptions").

[46]     *Id.*

[47]     *See id.* at 127 (citing SDC's "serious problem" in "completing work accurately without careless mistakes and working at a reasonable pace;" "obvious problem" in "paying attention when spoken to directly, refocusing to task when necessary, carrying out multi-step instructions, changing from one activity to another without being disruptive, organizing [her] own things or school materials, completing class/homework assignments, and working without distracting [her]self or others;" and a "slight problem" "carrying out single-step instructions and waiting to take turns").

complete the given tasks correctly."[48]  Travers found that SDC has problems

interacting and relating with others,[49] writing that she "receive[s] weekly

counseling in a small group at school[, and a] few times throughout [the] last

school year she had difficulty relating to her peers or one peer in the group."[50]

Travers found that SDC does not have a problem in moving about and

manipulating objects or caring for herself.[51]

### 4.    New York City Board of Education Records

While SDC was in the third grade, her teacher and parent requested

that the New York City Board of Education (the "BOE") evaluate her for special

education services.[52]  In order to "determin[e] whether [SDC had] an educational

disability," the BOE's Committee on Special Education ("CSE") requested a social

---

[48]    *Id.*

[49]    *See id.* at 128 (citing SDC's "obvious problem" in "seeking attention
appropriately, expressing anger appropriately, following rules, and introducing and
maintaining relevant and appropriate topics of conversation;" and "slight problem"
in "playing cooperatively with other children, making and keeping friends, asking
permission appropriately, respecting/obeying adults in authority, using language
appropriate to the situation and listener, and taking turns in a conversation").

[50]    *Id.*

[51]    *See id.* at 129-130.

[52]    *See id.* at 183.

-10-

history interview of Carthens and Veronica Conyers, SDC's maternal aunt.[53]  On

December 4, 2007, Carthens and Conyers met with social worker Stephen

Woloshin to discuss SDC's "school history," "birth and development," "family

composition/background," and "medical history."[54]  Based in part on this

interview, the BOE classified SDC as "learning disabled"[55] and recommended she

be given an Individualized Education Program (IEP).[56]

### 5.   Testimony

At the time of the hearing, SDC was twelve years old and in the fifth

grade.[57]  The ALJ questioned Carthens directly for most of the hearing and

Carthens's non-lawyer representative, Jasmine Ramirez, also asked him some

questions.  SDC did not testify.[58]  The hearing lasted eight minutes and generated a

fourteen-page transcript.[59]

---

[53]     *Id.* at 181, 183.

[54]     *Id.* at 183-186.

[55]     *Id.* at 193.  The BOE also found that SDC had a learning disability on
February 4, 2009, when it re-evaluated her special education needs.

[56]     *See* Addendum 2 to Pl. Mem.

[57]     *See id.* at 26-27.

[58]     *See id.*

[59]     *See id.* at 24-38.

Carthens testified that SDC "go[es] to therapy . . . outside of school,"
receives special education within school, and that he didn't "think she's doing well
in school."[60]  This is contradicted by his later testimony that SDC does not "see a
therapist outside of her school."[61]  He mentioned that she attends a "church and
boy club," at which she "get[s] like nervous and stuff" and has issues with "anger
management."[62]  The ALJ noted that Carthens was "kind of talking in generalities"
and asked Carthens if he knew of any specific incidents at the church club.
Carthens replied that the youth group director had not complained about SDC's
behavior, but SDC's teachers had commented that they were upset and concerned
about her behavior.  The ALJ did not ask further questions on that issue.[63]  When
the ALJ asked Carthens if there were things SDC could not do that other children
her age *could* do, he mentioned that she throws her clothes on the floor without
picking them up and throws "paper on the floor . . . instead of putting it in the
trashcan."[64]

Ramirez then asked Carthens questions about SDC's behavior at

---

[60]    *Id.* at 27-28.

[61]    *Id.* at 31.

[62]    *Id.*

[63]    *Id.* at 29.

[64]    *Id.* at 33.

school.  Carthens testified that "[s]he just sit up in the classroom, when she's asked a question, she just sit there and look at the teacher like, you know what's supposed to be going on.  I don't know.  And . . . she used to take herself, after she go to the bathroom, and smear it on the wall.  Get up on the sink.  I had to go in there, carry clothes over to the school on more than one day for her."[65]  According to Carthens, he meant that "SDC smeared feces on the bathroom wall at school" on more than one occasion.[66]  Neither Ramirez nor the ALJ asked follow-up questions to determine what Carthens actually meant.[67]

###    6.    Additional Evidence

Plaintiff points out that the record respecting the BOE's authorization of an IEP was out of order, missing five pages, and poorly copied, resulting in some pages being cut off at the end.[68]  He also notes that, pursuant to the BOE's Standard Operating Procedures Manual, an applicant for an IEP will receive an "individual psychological/psychoeducational evaluation."[69]  The purpose of this evaluation is to "explore and systematically study aspects of the student's

---

[65]    *Id.* at 36.

[66]    Pl. Mem. at 14.

[67]    *See id.*

[68]    *See* Pl. Mem. at 15; *see also* Addendum 2 to Pl. Mem.

[69]    Pl. Mem. at 16 and accompanying citation.

academic skill development, intellectual functioning, strengths, and weaknesses in cognitive/learning processes and social adaptive functioning."[70]  Plaintiff asserts that a full copy of the BOE's record, including the psychoeducational evaluation, is a necessary component of a complete administrative record.[71]

### 7.    The ALJ's Decision and Analysis

On January 26, 2010, the ALJ concluded that SDC "has not been under a disability within the meaning of the Social Security Act since May 9, 2007, the date the application was filed."[72]  The ALJ found that SDC was not engaged in substantial gainful activity and was suffering from "severe" asthma and a learning disability.[73]  Nonetheless, he found that these impairments did not meet or medically equal any listed impairment.[74]

The ALJ concluded that SDC's impairments did not "functionally equal" a disability.[75]  Although he found that SDC was markedly limited in her

---

[70]    *Id.*

[71]    *See id.* at 16-18.

[72]    Tr. at 7.

[73]    *Id.* at 10.

[74]    *See id.*

[75]    *See* 20 C.F.R. §§ 416.924(d) and 416.926.

-14-

ability to acquire and use information,[76] he determined that she had less-than-marked limitations in her abilities to attend to and complete tasks,[77] interact and relate with others,[78] and in her health and well-being.[79]  The ALJ further concluded that SDC had no limitation in her ability to move about and manipulate objects[80] or care for herself.[81]

In his overall analysis, the ALJ explained that he gave "significant weight . . . to the opinions of treating and examining medical sources" and "great weight . . . to the reports of teachers and the IEP prepared by the Board of Education."[82]  The ALJ gave "consideration to the testimony of [SDC]'s father but his statements did not support a finding that [her] impairments are of disabling

---

[76]     *See* Tr. at 13.

[77]     *See id.* at 13-14.  The ALJ noted that SDC "has been reported as having slight to obvious problems in this area.  She has been described as a hard worker but prone to creating distractions when work becomes difficult."  Tr. at 14. Without elaboration, the ALJ found "that [SDC] has less than marked limitations [in this area]," a finding "consistent with the opinions of [SDC]'s teachers."  *Id.*

[78]     *See id.* at 14-15.

[79]     *See id.* at 17.

[80]     *See id.* at 15-16.

[81]     *See id.* at 16.

[82]     *Id.* at 12.

severity."[83]

## III.   LEGAL STANDARD

### A.   SSA Regulations for Defining Childhood Disability

To be found disabled, a child must not be working; she must have a medically determinable impairment that is severe; and her impairment must meet or equal – medically or functionally – a listed impairment.[84]   An impairment will be found to functionally equal a listed impairment if it results in either a marked impairment in two domains or an extreme impairment in one domain.[85]   The six domains are: (1) acquiring and using information; (2) attending and completing tasks;[86] (3) interacting and relating with others;[87] (4) moving about and

---

[83]     *Id.*

[84]     *See* 20 C.F.R. § 416.924(a).

[85]     *See id.* § 416.926a(d).

[86]     The domain of attending and completing tasks gauges how well a child can focus and maintain attention.  *See id.* § 416.926a(h). Examples of limited functioning in this domain include: (1) being easily startled, distracted, or overreactive to stimuli that would not affect a normal child; (2) being slow to focus on, or fail to complete activities of interest; (3) being easily sidetracked from activities or frequently interrupting others; (4) getting easily frustrated and frequently giving up on tasks; (5) requiring extra supervision to keep engaged in an activity.  *See id*. § 416.926a(h)(3)(i)-(v).

[87]     The domain of interacting and relating with others considers how well the child initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.  *See*

manipulating objects;[88] (5) caring for oneself;[89] and (6) health and physical well-being.[90]

A child has a "marked" limitation in a domain when the impairment interferes seriously with her ability to "independently initiate, sustain, or complete activities."[91] A child has an "extreme" limitation in a domain when the impairment interferes very seriously with her ability to independently initiate, sustain, or complete activities.[92]

---

*id.* § 416.926a(i).

[88]    I do not describe this domain because Plaintiff does not assert, and the record does not indicate, that SDC is limited in her ability to move about or manipulate objects. *See id.* § 416.926a(j).

[89]    The domain of caring for oneself considers "how well [the applicant] maintain[s] a healthy emotional and physical state, including how well [she gets her] physical and emotional wants and needs met in appropriate ways." *Id.* § 416.926a(k). At SDC's age, children should "begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. [They] should begin to demonstrate consistent control over [their] behavior, and . . . should be able to avoid behaviors that are unsafe or otherwise not good for [them]. [They] should begin to imitate more of the behavior of adults . . . ." Tr. at 16.

[90]    The domain of health and physical well-being considers the "cumulative physical effects of physical or mental impairments and their associated treatments or therapies on [the claimant's] functioning." 20 C.F.R. § 416.926a(l). This domain considers combinations of impairments to determine whether a claimant has limitations in physical functioning. *See* Tr. at 17.

[91]    20 C.F.R. § 416.926a(e)(2)(i).

[92]    *See id.* § 416.926a(e)(3).

**B.     Standards for Remand**

A district court may affirm, reverse, or modify the Commissioner's

final decision.[93]  Remand is warranted where the ALJ has based a determination on

an improper legal standard or if further development of the record is necessary to

fill in evidentiary gaps.[94]  "'[B]ecause a hearing on disability benefits is a

nonadversarial proceeding, the ALJ generally has an affirmative obligation to

develop the administrative record.'"[95] The ALJ is under this obligation whether or

not the claimant is represented by counsel.[96]  The duty to develop the record is

even more stringent if the claimant is not represented by an attorney.[97]   SSA

regulations provide that an ALJ

> looks fully into the issues, questions [the applicant] and the other
> witnesses,  and accepts as evidence any documents that are material to
> the issues.  The [ALJ] may stop the hearing temporarily and continue it
> at a later date if he . . . believes that there is material evidence missing at
> the hearing.  The administrative law judge may also reopen the hearing
> at any time before he . . . mails a notice of the decision in order to

---

[93]     *See* section 405(g); *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004).

[94]     *See Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

[95]     *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting *Melville v. Apfel*, 190 F.3d 45, 51 (2d Cir. 1999)).

[96]     *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

[97]     *See Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990).

receive new and material evidence.[98]

Remand is also appropriate if the ALJ's rationale could be rendered more intelligible through further findings or a more complete explanation.[99]  The Commissioner has a duty to provide a claimant with a clear statement of the reasons for his decision[100] and must explain the weight he gave to medical and non-medical opinions to allow a subsequent reviewer to follow his reasoning.[101]

### C.    Relevant Evidence

"When [the ALJ] make[s] a determination or decision of disability, [he] will consider all of the available evidence in the individual's case record."[102] The ALJ must therefore consider information from both medical and non-medical sources.[103]

---

[98]    20 C.F.R. § 416.1444.

[99]    *See Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

[100]    *See, e.g.*, *Treadwell v. Schweiker*, 698 F.2d 137, 142 (2d Cir. 1983) ("[I]t is an elementary rule that the propriety of agency action must be evaluated on the basis of stated reason.").

[101]    *See* Titles II, XVI:II and XVI of the Social Security Ruling: Considering Opinions and Other Evidence from Sources Who Are Not "Acceptable Medical Sources" in Disability Claims ("SSR 06-03P"), 2006 WL 2329939 (Aug. 9, 2006).

[102]    *Id.*

[103]    *See id.*

### 1.    Medical Sources[104]

When a treating physician has obtained a "longitudinal picture of [the child's] impairment, [the SSA] will give the source's opinion more weight than [] if it were from a non-treating physician."[105]  The regulations set out factors to be considered in weighing medical opinions from treating sources, non-treating sources, and non-examining sources.  These factors include:  the treatment relationship between the individual and a treating source (*i.e.* the length, nature, extent, and frequency of examination); the degree to which the "acceptable medical source" presents an explanation and relevant evidence, including medical signs and laboratory findings, to support an opinion; and how consistent the medical opinion is with the record as a whole.[106]

### 2.    Non-Medical Sources

The ALJ's interpretation of findings by any medical source should reflect consideration of non-medical information from the child's teachers, therapists, parents, siblings, and other people who know the child.[107]  Often, these

---

[104]    "Acceptable medical sources" include licensed physicians, licensed psychologists, and qualified speech-language pathologists.  *See id.*

[105]    20 C.F.R. §  416.927(d)(2)(i).

[106]    SSR 06-03P.

[107]    *See* 20 C.F.R. § 416.924a(1)(iii).

sources have close contact with the child and have personal knowledge and expertise to make judgments about her impairment(s), activities, and level of functioning over a period of time.[108]

Under certain circumstances an opinion from a non-medical source may properly be determined to outweigh the opinion from a medical source. This may occur if the non-medical source has seen the child more often and has greater knowledge of her functioning over time, and if the non-medical source's opinion has better supporting evidence and is more consistent with the evidence as a whole.[109]

D.   **Evaluating the Evidence**

If a child has more than one impairment in a particular domain, the ALJ is to "look comprehensively at the combined effects of [the child's] impairments on [his or her] day-to-day functioning instead of considering the limitations resulting from each impairment separately."[110] This approach permits the combined effects of multiple impairments to be considered in determining the

---

[108]   *See id.* § 416.924a(2).

[109]   *See* SSR 06-03P.

[110]   20 C.F.R. § 416.924a(b)(4).

total level of a child's limitation in a particular domain of functioning.[111]

## IV.   DISCUSSION

### A.   The Parties' Contentions

Plaintiff asserts that remand is appropriate because the ALJ (1) failed to adequately develop the administrative record;[112] (2) failed "to make explicit findings in the domain of attending and completing tasks;"[113] and (3) "failed to recognize and take into account SDC's obesity as a medically determinable impairment."[114]  The Commissioner disputes each point.

### B.   Remand Is Required to Further Develop the Record

Because the ALJ determined that SDC was markedly limited in her ability to acquire and use information, a finding of a marked limitation in any other domain would have led to an award of SSI benefits.  The ALJ looked at extensive medical records from SDC's treating physicians and a consultative pediatrician,

---

[111]    *See id.*  This approach is flexible and inclusive to avoid concerns raised by the Supreme Court in *Sullivan v. Zebley*, 493 U.S. 521 (1990) (invalidating former SSA practice of determining childhood disability claims by only referencing certain listed impairments without regard to their cumulative effect on a child's functioning).

[112]    *See* Pl. Mem. at 13.

[113]    *Id.* at 21-22.

[114]    *Id.* at 23-25.

each of whom reported that SDC was, physically speaking, a well child.[115]  The

record was therefore sufficiently developed with respect to SDC's health and well-

being.  Further, SDC's ability to move about and manipulate objects is not in

dispute.

But the eight-minute hearing was insufficient for the ALJ to make a

determination with respect to the remaining three domains.  Dr. Virey and

Mohanty, who are not SDC's treating physician, determined that SDC was not

markedly limited in these listed domains.  However, SDC's teachers, Drexel and

Travers, each reported that SDC has obvious problems in attending and completing

tasks and interacting and relating with others.  Drexel noted that SDC has trouble

caring for herself due to an inability to control her emotions in the heat of the

moment.[116]  These questionnaires, to which the ALJ gave "great weight," were

completed simply by circling numbers to indicate the severity of SDC's problems

---

[115]    *See* Tr. at 11.  The physicians' unanimous agreement on wellness is
sufficient to defeat Plaintiff's argument with respect to the ALJ's failure to
consider obesity.  While Plaintiff is correct that obesity is a "medically
determinable impairment," the combined effects of which must be considered by
adjudicators in SSI determinations (*see* Pl. Mem. at 23-24 and accompanying
citations), the ALJ impliedly considered SDC's obesity when reviewing Dr. Gray's
medical reports.  Dr. Gray concluded that SDC was a "well child" despite his
diagnosis of her obesity and referral to a nutritionist.  *See* Tr. at 172-173, 205.

[116]    *See supra* nn. 32-50.

and then providing very brief explanations.[117]  When short-form answers state that a claimant has serious or obvious problems in certain domains, findings of less-than-marked limitations require a more thoroughgoing investigation than an eight-minute interview with the claimant's father.

When Carthens indicated that SDC smeared feces on the school bathroom's wall on multiple occasions, the ALJ did not ask clarifying questions. Such behavior, if proven, would be extremely persuasive evidence of a marked limitation in the ability to care for oneself.[118]  But the ALJ remained silent instead of asking follow-up questions.[119]  He then found that Carthens's statements did not support a finding of disabling impairments.[120]  Before making that determination, the ALJ was obliged to seek clarification of SDC's allegedly disturbing behavior. This omission alone would be sufficient to remand for further development of the record.

### C.   Remand Is Required to Generate More Explicit Findings with Respect to SDC's Ability to Attend and Complete Tasks

The ALJ failed to adequately specify the basis for his conclusions

---

[117]   *See* Tr. at 115-132.

[118]   *See supra* n. 89.

[119]   *See* Tr. at 36.

[120]   *See id.* at 12.

-24-

regarding SDC's ability to attend and complete tasks.  In finding that SDC was not limited in this domain, the ALJ wrote: "the[] claimant has been reported as having slight to obvious problems in this area.  She has been described as a hard worker but prone to creating distractions when work becomes difficult.  I find that the claimant has less than marked limitations in attending and completing tasks."[121]

The ALJ incorrectly stated that SDC was reported to have only "slight to obvious problems."  The record shows that Travers reported a "serious problem" in completing work accurately without careless mistakes and working at a reasonable pace – SDC manifested these problems on a weekly and daily basis, respectively.[122]  The ALJ specified no reason why he found Drexel's report more convincing than Travers's with respect to this domain, or why he chose to exclude the reported "serious problems" from his analysis.  Given the regulations' parallelism respecting "serious" problems and "marked limitations,"[123] remand is necessary to explain why the ALJ declined to cite Travers's report.

## V.    CONCLUSION

---

[121]     *Id.* at 14.

[122]     *Id.* at 127.

[123]     *See* 20 C.F.R. § 416.926a(e)(2)(i) ("We will find that you have a '*marked*' limitation in a domain when your impairment(s) interferes *seriously* with your ability to independently initiate, sustain, or complete activities.") (emphasis added).

In light of the foregoing, upon remand, the ALJ must re-evaluate SDC's functional equivalence with regard to the following domains:  attending and completing tasks, interacting and relating with others, and caring for herself.  Upon further review, the ALJ must take into account the complete record, including the full report from Travers.  In order to create a more complete record, the BOE's individual psychoeducational analysis of SDC must also be considered.  Further detail must be provided respecting SDC's erratic behavior in the school bathroom.  The ALJ might also consider taking testimony from SDC, despite Carthens's initial decision to be the sole witness.  If the ALJ chooses to give controlling weight to certain sources, the ALJ must provide a reasonable explanation for doing so.  The ALJ must also provide a reasonable basis why the multiple impairments detailed by Drexel and Travers did not, in the aggregate, rise to the level of a marked limitation.

Accordingly, Carthens's motion to remand this matter is granted pursuant to sentence six of section 405(g) so that the ALJ may further develop the record and provide explanations for his findings and conclusions.  The Commissioner's cross-motion for judgment on the pleadings is denied.  The Clerk of the Court is directed to close these motions [Docket Nos. 11 and 14].  The parties are hereby directed to notify Chambers once the ALJ, on remand, re-

evaluates whether SDC is disabled.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 5, 2011

**- Appearances -**

**For Plaintiff:**

Michael D. Hampden, Esq.
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York, NY 10016
(212) 683-7999 ext. 226

**For Defendant**:

Susan C. Branagan
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, NY 10007
(212) 637-2804